UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
JACK RHODES,                                                         :     15-CV-4263 (ARR)
                                                                     :
                    Petitioner,                                      :     NOT FOR ELECTRONIC
                                                                     :     OR PRINT PUBLICATION
         -against-                                                   :
                                                                     :     OPINION & ORDER
STEVEN RACETTE, Superintendent, Clinton Correctional                 :
Facility, and ERIC T. SCHNEIDERMAN, Attorney General                 :
of New York State;                                                   :
                                                                     :
                    Respondents.                                     X
--------------------------------------------------------------------

ROSS, United States District Judge:

Jack Rhodes petitions under 28 U.S.C. § 2254 for habeas corpus relief from a New York state conviction and sentence of seventy-five years in prison. Following trial, a jury found Rhodes guilty of various charges relating to a series of robberies. Rhodes now claims that he was deprived of his right to confrontation because the trial court curtailed his cross examination of a prosecution witness. This argument was rejected on direct appeal. Because, as discussed below, Rhodes fails to show that the state court decision denying his Confrontation Clause claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, I deny his petition and dismiss his claim.

## BACKGROUND

### A. Investigation by Detective Alger

Rhodes was convicted of perpetrating three robberies. First, on December 30, 2006, Angela Khan, aged fifty-three, saw an unknown man in her parking garage when she exited her

car. Tr. 1357:3, 1364:6-1365:13, ECF No. 11-17 at 109, 116-17.[1] The man approached her and asked her to let him into the building, as he did not have his key. Tr. 1367:15-23, id. at 119. She let him into the building, and he followed her to the garbage collection room, where he assaulted and robbed her. Tr. 1369:23-1370:2, 1373:18-1374:15, id. at 121-22, 125-26.

On March 4, 2007, Rose Morat, aged one hundred one years, was approached at the foyer of her apartment building by a man purporting to offer her assistance with the door. Aff. Mem. Law Opp. Pet. Writ Habeas Corpus, ECF No. 10 ("Traill Aff."), at ¶ 6.[2] As she walked through the door, the man punched Morat in the face and pushed her to the floor. Id. He stole her pocketbook and fled. Id. That same afternoon, Solange Elizee, aged eighty-six years, also encountered a man in the lobby of her apartment building. Id. ¶ 7. He followed her to her apartment, pushed inside behind her, assaulted her, and stole two rings from her fingers. Id.

Detective Chris Alger was assigned to investigate the robberies of Morat and Elizee. Tr. 1094: 14-17, ECF No. 11-15 at 150. Alger determined that the Khan robbery also fit the pattern of the two later robberies. Tr. 1119:19-1120:15, ECF No. 11-16 at 23-24. Police initially determined the perpetrator to be a black man, between 25-40 years old, 160-200 pounds, and 5'8" to 5'10". Tr. 1119:3-10, ECF No. 11-16 at 23; Tr. 1258:17-1261:24, 1267:3-24, 1270:1-1271:4, ECF No. 11-17 at 10-13, 19, 22-23. Before Rhodes was identified as a suspect, several

---

[1] Citations to "Tr." refer to the trial transcript, found at ECF No. 11-1 through ECF No. 11-20. The first page and line number listed after "Tr." refers to the original numbering of the trial transcript; the page number following "ECF No." locates the citation in the document filed on the docket for this proceeding.

[2] The testimony of the two elderly victims was presented by videotape during trial or a pretrial suppression hearing. These videotapes were neither transcribed nor otherwise included in the record provided to this court. Therefore, this account is taken from the affidavit provided by the state in its answer to the present motion. This affidavit is also cited to where it accurately summarizes the record and does not differ in any material respects from petitioner's account of the facts.

eyewitnesses viewed hundreds of photographs of potential suspects but made no identifications. Tr. 1096:11-1106:15, ECF No. 11-15 at 152-ECF No. 11-16 at 10. Police also disseminated posters featuring a surveillance photograph taken during the Morat robbery. Tr. 1095:12-16, ECF No. 11-15 at 151. Hundreds of tips were reported to police. Tr. 1207: 11-16, ECF No. 11-16 at 111.

These efforts did not result in an arrest. Tr. 1334:5-10, ECF No. 11-17 at 86. In order to identify new leads, Alger searched a database of prior arrestees for photographs matching the description given by the eyewitnesses, except that he changed the age parameter to 40-45 years. Tr. 1128:3-1129:21, ECF No.11-16 at 32-33; see also Tr. 1108:3-1109:12, id. at 12-13 (describing database of photographs). As a result of this search, Alger came across a photograph of Rhodes, whom he determined resembled the surveillance footage. Tr. 1130:13-1131:12, id. at 34-35. Elizee, Khan, and two eyewitnesses came to the police station to view a line up including Rhodes. Tr. 1159:10-20, id. at 63. All four identified him as the perpetrator. Tr. 731:6-739:13, ECF No. 11-13 at 108-16; Tr. 823:13-827:7, ECF No. 11-14 at 39-43; Tr. 1312:8-10, 1385:5-22, ECF No. 11-17 at 64, 137. Because she was too ill to attend the lineup, Morat was shown a photo array including Rhodes, and also identified him as the perpetrator. Tr. 1155:21-1156:22, ECF No. 11-16 at 59-60; Tr. 1308:10-12, ECF No. 11-17 at 60. Alger prepared the lineup and photo array. Tr. 1132:5-24, 1153:13-1155:13, ECF No. 11-16 at 36, 57-59.

**B. Rhodes's Second Trial[3]**

During jury selection, the court had informed prospective jurors that he "anticipate[d] two, two and a half weeks of trial." Tr. 262:13-14, ECF No. 11-10 at 90. In fact, the trial lasted over a month. The state called twenty witnesses, Tr. 1719:19-1720:14, ECF No. 11-20 at 54-55,

---

[3] Rhodes's first trial resulted in a mistrial. Traill Aff. ¶ 11.

3

including two of the victims.  Tr. 607:13-18, ECF No. 11-12 at 123; Tr. 1356:12-16, ECF No. 11-17 at 108.  The state also called two eyewitnesses who were present at an apartment building shortly before a robbery and had seen the perpetrator shortly before he encountered the victim. Tr. 718:24-737:24, ECF No. 11-13 at 95-114; Tr. 809:8-826:6, ECF No. 11-14 at 25-42.  Each had identified the defendant as the perpetrator in the lineup and was cross-examined about the lineup and photo arrays in which (s)he participated.  E.g., Tr. 755:3-757:30, ECF No. 11-13 at 132-34; Tr. 847:14-850:10, ECF No. 11-14 at 63-66.  One eyewitness made an in-court identification of the defendant.  Tr. 827:15-828:7, ECF No. 11-14 at 43-44.

The state also presented testimony from four detectives.  Tr. 1720:6-9, ECF No. 11-20 at 55.  Of relevance to the present petition, Sergeant Kenneth Kearns, Detective Alger's supervisor, Tr. 1029:24-1030:24, ECF No. 11-15 at 85-86, testified that he was present for, and assisted with, the lineup.  Tr. 1022:23-1029:16, id. at 78-85.  The defense cross examined him about the lineup and photo arrays.  See Tr. 1031:35-1053:6, id. at 87-109.  The cross examination of Sergeant Kearns continued until Rhodes had "[n]o further questions," Tr. 1053:13, id. at 109, and two re-cross examinations were allowed, Tr. 1067:18-1073:16, 1080:7-1081:1, id. at 123-29, 136-37.

Finally, Detective Alger testified about his investigation, including the photo arrays, lineup and his photo system search that first identified the defendant.  See generally Tr. 1092:18-1189:10, ECF No. 11-15 at 148-ECF No. 11-16 at 93.  Alger also recounted the following exchange with Rhodes, which occurred in an interrogation room before the lineup:

> I asked Jack Rhodes why did you beat and rob the old ladies.  His response, I have a drug problem, a crack problem.  I repeated the question, why would you beat and rob a 101 year old woman.  His response was, my life is over.  I'm sorry anyone got hurt.  Now, during that time he had made . . . an utterance . . . He had his head in his hands and he was shaking his head like this, I have to show you guys . . . that I am remorseful without telling you what happened.

4

Tr. 1162:24-1163:21, ECF No. 11-16 at 66-67.  Detective Alger's cross examination is discussed in detail below.

The defense presented no witnesses.  See Tr. 1719:17-1720:14, ECF No. 11-20 at 54-55.

**C. Cross Examination of Detective Alger**

Rhodes's present petition concerns the cross examination of Detective Alger, which is therefore recounted in detail.  The defense attorney began this examination by repeatedly pointing out the fact that certain investigative steps were not documented by written reports.  E.g., Tr. 1195:21-25, 1197:22-1198:5, 1199:8-10, 1205:8-12, ECF No. 11-16 at 99, 101-03, 109.  In most cases, Detective Alger testified to taking the investigative step, although he did not have written corroboration.  E.g., Tr. 1197:25-1198:1, 1199:8-10, id. at 101-03.  After numerous questions about whether certain steps were documented – comprising about twenty pages of the trial transcript – the court admonished the defense attorney to "[m]ove to another area."  Tr. 1206:6-7, id. at 110.

The defense attorney then discussed tips submitted by the public.  Tr. 1206:20-22, id. at 110.  He questioned Detective Alger in depth about eight of the hundreds of tips received.  Tr. 1207:14-1223:5, id. at 111-27.  During this line of inquiry, the court instructed Rhodes's attorney to speed up his questioning twice.  Tr. 1210:2-4, 1213:25, id. at 114, 117.  In response, Detective Alger repeatedly explained that the photograph of any person identified by a tip was shown to eyewitnesses, regardless of the specific circumstances of the tip.  E.g., Tr. 1221:16-18, id. at 125-26.

Rhodes then questioned Detective Alger about the surveillance tapes recovered from the robberies of Khan and Morat, Tr. 1224:19-1233:12, id. at 128-37, in an apparent attempt to lay foundation to introduce into evidence a sketch artist's rendering based on viewing the

5

surveillance footage, Tr. 1233:13-1238:15, id. at 137-42. The court did not accept it into evidence because the sketch was created in an unusual manner – from viewing surveillance footage available to the jury, rather than discussions with eyewitnesses – and, in any event, was not used in the investigation. Tr. 1236:11-20, id. at 140. Even after the court advised that the exhibit would not be accepted as a business record, Tr. 1236:24-25, id., defense counsel spent an additional eighteen questions attempting to lay this foundation before the court adjourned for lunch, Tr. 1238:19-1241:21, id. at 142-45. After lunch, defense counsel asked an additional nineteen questions on the topic of the artist's sketch. Tr. 1244:8-1247:5, id. at 148-51. After the court once again sustained an objection keeping the sketch out of evidence, defense counsel continued to question the witness about the sketch, Tr. 1253:8-1255:12, ECF No. 11-17 at 5-7, even after the court asked him to "[m]ove to another area," Tr. 1253:25, id. at 5.

Defense counsel next questioned Detective Alger briefly about the lack of physical evidence in the case, Tr. 1255:13-1258:16, id. at 7-10, followed by an overview of the descriptions the victims and eyewitnesses gave of the assailant, Tr. 1258:17-1262:15, 1265:21-1271:16, id. at 10-14, 17-23. During the discussion of the eyewitness descriptions, defense counsel also asked a series of detailed questions about another tip received by the police department. Tr. 1262:16-1265:18, id. at 14-17. During this line of questioning, the court remarked that it was "going a little far afield," Tr. 1264:24-25, id. at 16, and asked defense counsel to "[t]ry to move it along," Tr. 1271:22, id. at 23.

The next line of questioning concerned the photo manager system used to display photographs to eyewitnesses and the lack of written documentation regarding which witnesses were shown which photographs. Tr. 1271:23-1281:22, id. at 23-33. During this series of questions, the court again asked defense counsel to "[p]lease move it along." Tr. 1277:14, id. at

6

29.

At this point, counsel finally began questioning Detective Alger about his decision to change the input parameters for the photo manager search. Tr. 1281:19-1282:3, id. at 33-34. After a few questions, the court asked counsel to approach. Tr. 1282:5-6, id. at 34. Noting that the cross examination had gone on for nearly three hours, the court gave defense counsel a half hour to finish the cross examination. Tr. 1282:15-21, id. In imposing this limit, the court pointed out that defense counsel had been late to return from the last break and that defense counsel had "a cadence that is very slow." Tr. 1282:9-21, id.

After this conversation, defense counsel did not resume his line of questioning about Detective Alger's decision to pull Rhodes's photograph from the photo manager. Instead, he asked (1) a few questions summarizing the investigative steps taken, Tr. 1283:10-1284:5, id. at 35-36, at least two of which had already been asked, see Tr. 1223:9-13, 1224:14-18, ECF No. 11-16 at 127-28; and (2) repeated questions about the photographs Alger had shown Khan, ten of which probed, yet again, whether a written report could corroborate his answer, Tr. 1285:4-1287:13, ECF No. 11-17 at 37-39. Defense counsel then returned to asking Alger about his decision to change the input parameters for his search. Tr. 1287:18-1292:18, id. at 39-44.

At this point, the court reminded defense counsel that "[t]wenty minutes ago I told you you had half an hour." Tr. 1294:1-2, id. at 46. The court noted that defense counsel was "tak[ing] a minute between each question." Tr. 1294:7-8, id. Defense counsel continued questioning Detective Alger about the search that yielded the defendant's photograph. Tr. 1294:15-1298:3, id. at 46-50.

Defense counsel had begun questioning Algers about the photo array, Tr. 1298:4-1299:25, id. at 50-51, when the court informed him that his limit had expired and offered

7

"another five or 10 minutes to start wrapping it up." Tr. 1300:5-9, id. at 52. Defense counsel protested: "I have to ask him about the photo array. I have to ask him about the line-ups. I have to ask him about the interrogation." Tr. 1300:10-12, id.

After this exchange, defense counsel continued to question Algers about the photo array, Tr. 1301:10-1316:4, id. at 53-68, for an additional half hour before the court again reminded him of the time limit. Tr. 1316:12-14, id. at 68. At this time, the court reminded defense counsel that he was "nearing four hours" and gave him five more minutes. Tr. 1316:17-1317:1, id. at 68-69. When defense counsel protested, the court reminded him that it was his responsibility to manage his cross examination, stating: "[I]f you choose to spend over three hours on your cross on what you chose to spend it on and now tell me you need time to go into your lineup, the way you manage your cross-examination is your business." Tr. 1300:25-1301:4, id. at 52-53.

After several additional questions about the photo array, Tr. 1317:3-1319:14, id. at 69-71, the court ended cross examination. Tr. 1319:19, id. at 71. Defense counsel requested permission to "just ask three questions about the lineup," which the court allowed. Tr. 1319:24-25, 1320:18-1321:9, id. at 71-73. In ending the cross examination, the court noted that defense counsel was "familiar with the prior trial." Tr. 1321:16-18, id. at 73. (Indeed, the same attorney had represented Rhodes at both trials.) In total, the cross examination lasted approximately four and a half hours. Tr. 1346:5-6, id. at 98.

The prosecution then conducted a redirect examination of Detective Alger. Tr. 1322:3-1333:10, id. at 74-85. On re-cross examination, the court repeatedly sustained objections to questioning outside of the scope of the redirect examination. E.g., Tr. 1334:20-22, 1337:1-2, 1338:10-14, id. at 86, 89-90. A similar ruling precluded defense counsel from questioning Detective Algers about the conversation he had with Rhodes in the interrogation room. Tr.

1340:4-14, id. at 92.  Defense counsel conducted a re-cross examination until he had "[n]o further questions."  Tr. 1343:22, id. at 95.

After the jury was excused, defense counsel moved for a mistrial based on the time limit imposed on the cross examination.  Tr. 1344:21-1345:16, id. at 96-97.  The court denied this motion, noting that defense counsel had conducted "the longest . . . cross-examination of an assigned detective [the judge had seen] in 31 years."  Tr. 1346:13-15, 1347:3-4, id. at 98-99.  Defense counsel later requested that the court "incorporate by reference" his cross-examination of Detective Alger from the prior trial; the court denied this application.  Tr. 1355:5-11, id. at 107.

### D. Procedural History

The jury found Rhodes guilty of eleven counts of burglary, robbery, assault, and hate crimes.  Triall Aff. ¶ 11.  The court sentenced Rhodes to an aggregate prison term of seventy-five years and five years of post-release supervision.  Id. ¶ 12.

Rhodes appealed this conviction, raising the following six arguments: (1) that he was deprived of his right to confrontation because of the time limit imposed on his cross examination of Detective Alger; (2) that the court should have allowed him to call Elizee at a pretrial suppression hearing; (3) that the court erred by allowing Morat's testimony to be played via tape; (4) that the court abused its discretion by denying him permission to call an expert on eyewitness identification; (5) that the prosecution's summation denied him a fair trial; and (6) that his sentence was harsh and excessive.  Id. ¶ 13.  The Appellate Division rejected all of his claims on the merits.  People v. Rhodes, 981 N.Y.S.2d 548, 548-50 (N.Y. App. Div. 2014).  As relevant here, the Appellate Division found that the trial court "providently exercised its discretion in placing a time limit on cross examination of a certain prosecution witness."  Id. at 549.  The

9

Court of Appeals denied petitioner leave to appeal. People v. Rhodes, 11 N.E.3d 724, 724 (N.Y. 2014).

## STANDARD OF REVIEW

A federal court may only consider the merits of a habeas claim if that claim has been exhausted. See 28 U.S.C. § 2254(b)-(c). In such case, federal habeas courts must apply a deferential standard when reviewing state court convictions. See id. § 2254(d). The relevant statute provides, in pertinent part, that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id.

The statutory language "'clearly established Federal law, as determined by the Supreme Court of the United States'. . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court "precedent if the state court applies a rule that contradicts Supreme Court precedent" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively

unreasonable." Id. at 409. Further, "[the Supreme] Court has held on numerous occasions that it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (quoting 28 U.S.C. § 2254(d)(1)).

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98 (2011). "[A] federal court may not issue the writ simply because that court concludes on its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Rodriguez v. Miller, 537 F.3d 102, 109-10 (2d Cir. 2007) (citing Williams, 528 U.S. at 411). Nor may a federal court issue a writ simply to "correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002). This deferential standard of review "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

## DISCUSSION

Petitioner argues that he was deprived of his Sixth Amendment right to confrontation because the court imposed a time limit on his cross examination of Detective Alger. Pet'r's Mem. Law Support Pet. Writ Habeas Corpus Under 28 U.S.C. § 2254, ECF No. 1-2 ("Pet'r's Mem."), at 62. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (alteration omitted) (quoting Davis v. Alaska, 415 U.S. 308, 315-16 (1974)). Cross examination

11

is essential to test "the believability of a witness and the truth of his testimony[,] . . . to delve into the witness' story to test the witness' perceptions and memory[,] . . . [and] to impeach, i.e., discredit, the witness." Davis, 415 U.S. at 316.

"Supreme Court precedent interpreting the Confrontation Clause establishes only general rules that give trial judges 'wide latitude' to restrict cross-examination, subject only to the equally general requirement that the defense be given a 'meaningful opportunity' to test the credibility of prosecution witnesses." Watson v. Greene, 640 F.3d 501, 509 (2d Cir. 2011) (quoting Van Arsdall, 475 U.S. at 679, Crane v. Kentucky, 476 U.S. 683, 690 (1986)). For example, the Supreme Court has found violations of the Confrontation Clause where a court prevented a defendant from cross examining a state witness to show (1) that the witness was currently on probation for a similar crime and therefore had a motive to identify a suspect to the police and deflect suspicion from himself, Davis, 415 U.S. at 311; (2) that the prosecution had dismissed the witness's public drunkenness charge in exchange for the witness's testimony, Van Arsdall, 475 U.S. at 679; and (3) the victim's relationship with the defendant's half brother, Olden v. Kentucky, 488 U.S. 227, 230-31 (1988) (per curiam).

While limits on the subject matter of cross examination are thus subject to a searching review, time limits are generally within the trial court's discretion, and "[a] trial judge abuses his discretion in curtailing cross-examination of a government witness when the curtailment denies the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." United States v. White, 692 F.3d 235, 248 (2d Cir. 2012) (quoting United States v. Blanco, 861 F.2d 773, 781 (2d Cir. 1988)); see also Martin v. Ercole, No. 07-CV-7171(KMK), 2012 WL 4465854, at *2 (S.D.N.Y. Sept. 27, 2012) (denying habeas petition based on "strict" time limit at trial because "trial judges

retain 'broad discretion' to limit inquiry, even the cross-examination of prosecution witnesses" (quoting United States v. Coppola, 671 F.3d 220, 247 n.21 (2d Cir. 2012))).

In fact, the Supreme Court has explained that the right to confrontation guarantees only the "opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Van Arsdall, 475 U.S. at 679 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)). Therefore, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679; see also Davis, 415 U.S. at 316 (stating that cross examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation"). Several circuits have interpreted this standard to provide that "a trial court may limit cross-examination 'after the questioner has had reasonable chance to pursue the matters raised on direct.'" United States v. Vest, 116 F.3d 1179, 1186 (7th Cir. 1997) (quoting United States v. Caudle, 606 F.2d 451, 459 (4th Cir. 1979)).[4]

The key question, then, is whether Rhodes had a "reasonable chance" to cross examine Detective Alger about his investigation. Petitioner contends that he did not, because his cross examination was cut off before he had an opportunity to address the lineup or confession. Pet'r's Mem. at 67. According to petitioner, the cross examination was establishing the theory that Alger "single-minded[ly]" pursued Rhodes and "ignored far better suspects." Id. at 68.

Rhodes's counsel did not question Alger about the confession or lineup, undoubtedly

---

[4] The Supreme Court has never specifically addressed the extent to which time limits imposed on cross examination may violate a criminal defendant's right to confrontation.

13

important subjects for this cross examination. These omissions might be attributed to the attorney's poor time management on cross examination. See, e.g., Tr. 1294:7-8, ECF No. 11-17 at 46 (defense counsel was "tak[ing] a minute between each question"); Tr. 1320:9-10, id. at 72 (defense counsel "spent the most of [his] cross examination on anonymous tips").

But that leaves open the question of whether Rhodes could have completed his cross-examination had he used his time wisely. After reviewing the trial record, I conclude that he could have. Defense counsel had four and a half hours to cross examine Detective Algers. Tr. 1346:5-6, id. at 98. He spent most of this time on two tasks of marginal importance: (1) asking detailed questions about nine different tips submitted to the department – up to fourteen questions on a single tip, see, e.g., Tr. 1262:16-1265:18, id. at 14-17; and (2) discussing an artist's sketch that was not used in the investigation and not admissible at trial, Tr. 1224:19-1255:12, ECF No. 11-16 at 128 through ECF No. 11-17 at 7. Nor can petitioner argue that his trial counsel was unprepared for Alger's testimony. As the court noted, he had already cross examined this witness in petitioner's first trial. Tr. 1321:16-18, ECF No. 11-17 at 73.

In addition, the court was flexible in imposing the time limit. After imposing the initial thirty minute limitation, and warning defense counsel when ten minutes remained, the court nonetheless allowed an additional "five or 10 minutes to start wrapping it up." Tr. 1300:5-9, id. at 52. Thirty minutes after that, the court gave defense counsel five more minutes to finish his cross examination. Tr. 1316:18-1317:1, id. at 68-69. And then, after ending the cross examination, the court allowed defense counsel to ask the three additional questions he requested. Tr. 1319:24-25, 1320:18-1321:9; id. at 71-73. Furthermore, as the court imposed time limitations, defense counsel failed to move immediately onto more relevant topics. See, e.g., Tr. 1283:10-1284:5, id. at 35-36.

14

Further, the court had a legitimate interest in the orderly progression of the trial. See Chambers v. Mississippi, 410 U.S. 284, 295 (1973) ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (citing Mancusi v. Stubbs, 408 U.S. 204 (1972))). During jury selection, the court had informed prospective jurors that it "anticipate[d] two, two and a half weeks of trial." Tr. 262:13-14, ECF No. 11-10 at 90. At the cross examination of Detective Alger, four weeks had already elapsed, Tr. 1283:3-4, ECF No. 11-17 at 35, and the state had yet to close its case-in-chief. The court faced the possibility that a juror would need to be excused as the trial progressed.

Under these circumstances, it cannot be said that "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington, 562 U.S. at 103. Rhodes had an adequate opportunity to cross examine Detective Alger; that he chose not to is not redressable on habeas review. See Fenenbock v. Dir. of Corr. for Cal., 692 F.3d 910, 919 (9th Cir. 2012) (denying habeas relief where trial court imposed a time limit on cross examination because "[g]enerally speaking, a court violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic, such as bias").

## CONCLUSION

Because petitioner has failed to show that the state court unreasonably applied a clearly established federal rule, the petition is denied.

SO ORDERED.

                                                          /s/
                                            Allyne R. Ross
                                            United States District Judge

Dated:       January 4, 2017
                Brooklyn, New York